1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JUAN C. MONTOYA,                    No. CIV S-06-2082-FCD-CMK-P

12              Petitioner,

13        vs.                            FINDINGS AND RECOMMENDATIONS

14   WONG,

15              Respondent.

16   _____/

17              Petitioner, a state prisoner proceeding with counsel, brings this petition for a writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are Petitioner's first

19   amended petition for a writ of habeas corpus (Doc. 26), Respondent's answer (Doc. 31), and

20   Petitioner's reply (Doc. 40).

21                            **I.  BACKGROUND**

22        **A.      Facts**

23              The California Court of Appeals, on Petitioner's direct appeal, recited the

24   following facts, and Petitioner has not offered any clear and convincing evidence to rebut the

25   / / /

26   / / /

1   presumption that these facts are correct[1]:

2           Around 11:30 the night of September 10, 2003, Woodland
3   Police Officer Timothy Keeney stopped Montoya briefly on the
    northwest corner of Court Street and Fifth Street for riding his
    bicycle without a light.  Montoya told Keeney he was going to the
4   7-Eleven store.  He was acting nervous but consented to a pat
    search of his clothing.  Keeney found no weapons.  Montoya's
5   counsel asked on cross-examination whether her client appeared to
    be "under the influence."  Keeney responded that he was not a
6   "drug certified person" and there was no indication in his report
    that Montoya was under the influence of a controlled substance.

7
            Shortly after midnight, Daniel Rangel heard yelling then
8   screams outside his residence at the corner of North Street and
    Fifth Street.  From his porch, Rangel saw two men from the
9   neighborhood, identified at trial as Montoya and Morales, running
    north on Fifth Street.  Rangel heard Montoya say, "I'm tired of this
10  shit."  After Montoya and Morales ran away, Rangel and another
    resident went to investigate.  They found a man lying in a pool of
11  blood in the alley off Fifth Street and called for an ambulance.

12          Medical personnel arrived and found Jesus Alderete lying
    face down in a pool of blood with no breath or pulse.  Alderete was
13  pronounced dead at the hospital at 12:35 a.m.

14          Police investigators found no weapons in the alley or in the
    adjacent yards.  They did, however, find a black nylon knife sheath
15  on Fifth Street near the alley.  Investigators also discovered shoe
    prints along the alley fence and blood on the fence all the way to
16  the street.

17          Angelica Roa, Alderete's cousin, went to the crime scene in
    the early afternoon of September 11, 2003.  As she entered the
18  alley, Roa saw two men behind the house where Alderete had
    lived.  One of the men, whom she identified at trial as Montoya,
19  was drinking a beer.  Montoya told Roa he was sorry about what
    happened to Alderete, adding that he "didn't expect something like
20  that to happen around that area."  Montoya also indicated that he
    had known Alderete for a long time and although they were not
21  good friends, "they got along fine."  He acknowledged to Roa that

22  / / /

23  _____

24          [1]      Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a
    State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this
    presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from
25  the state appellate court's opinion, filed in this court as exhibit B to Respondent's answer.
    Petitioner is also referred to as "Montoya," his co-defendant is referred to as "Morales," and the
26  victim is referred to "Alderete."

2

he hung around with "the southerners" while Alderete hung out with "the northern." At one point during the conversation, Montoya showed Roa a scar on his back.

Police arrested Montoya on the morning of September 12, 2003, after learning Rangel had seen him running from the scene of the crime. Woodland Police Detective Joshua Simon advised Montoya of his *Miranda* rights. [FN2] Montoya talked with him for over an hour. The prosecution played a videotape of the interview at trial and the jury received a transcript.
[FN2: *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L. Ed. 2d 694].]

Montoya initially told Simon that he was riding his bicycle home from the 7-Eleven store around 10:00 p.m. on September 10, when a police officer stopped him for not having a light on the bike. He said he went home after that encounter and watched a movie. Montoya acknowledged he knew Alderete by his nickname "Chongo" but never talked to him. He knew that Chongo lived on the alley where he was killed.

Simon told Montoya that someone had seen him running away from the area where Alderete's body had been found. According to Simon, Montoya's demeanor changed. He crossed his arms and appeared to be nervous. In addition, Montoya's hands were shaking and his breathing was "kind of jagged." Montoya told Simon he had been stabbed a year earlier near the hot dog stand on Fifth Street by a Norteño he did not know. Montoya acknowledged he was a Sureño.

When Simon reminded Montoya that he had been seen running from the scene with another person, Montoya offered a second version of what happened. He told Simon that he encountered Alderete at the entrance to the alley off Fifth Street as he was riding his bike home from Freeman Park. Montoya said Alderete started "talking shit to [him]." Specifically, Alderete called Montoya "scrap," a disrespectful term for a Sureño. According to Montoya's second story, Alderete started to box with him then pulled out a knife. A friend of Montoya's came up and hit Alderete from behind. Montoya told Simon he got the knife away from Alderete and stabbed him with it. He stated he was not sure how he got the knife, but said he stabbed Alderete in the back no more than two or three times. Referring to Alderete, Montoya continued, "You know I'm tired of that fool too, you know. Always fuckin, fuckin with my mom. Whatever you know. Fucking always talking shit."

Montoya elaborated on what happened earlier in the evening. He said he was mad at a friend and had gone to a park to fight him. However, Montoya's friend did not want to fight, so he left for home. Montoya told Simon that when Alderete began

talking "bullshit" to him, he thought to himself, "I have to bust somebody, you know, so I can go happy." He refused to give Simon the full name of his friend, but eventually identified Morales from a photograph. Montoya also confirmed that Morales hit Alderete with a rock or piece of concrete from the alley and punched Alderete with his fists.

Simon told Montoya he suspected Montoya brought the knife to the fight and suggested the police might find his fingerprints on the knife sheath. At that juncture, Montoya changed his story again. He acknowledged the knife was his and he had been carrying it until the police officer stopped him on his bicycle. Montoya said he threw the knife away toward the alley when he saw the officer making a U-turn to approach him. When Alderete started "talking shit" to Montoya on his way home, he turned around, rode back to pick up the knife, and returned to where Alderete was standing. Alderete swung at Montoya a couple of times, but missed. At that point, Morales came up and hit Alderete from behind. Montoya told Simon that when Alderete moved toward the fence, "I turned back and did it." According to Montoya, he discarded the knife.

During the interview, Detective Simon observed several gang-related tattoos on Montoya's body, including the numbers one and three on the inside of his middle finger, three dots on his elbow, and "Little Sur" on his thigh. A search of Montoya's residence revealed CD's by gang-related artists with covers featuring gang symbols and graffiti. Photos displayed in the residence showed Montoya and the words "Sur 13."

Police arrested Morales in a bedroom of Montoya's residence and brought him to the police station for interrogation on the afternoon of September 12, 2003. Detective Simon read Morales his *Miranda* rights and Morales talked with him. The prosecution played a videotape of the interview at trial and the jury received a copy of the transcript.

Morales told Simon he received a phone call from Montoya late on the night of September 10, 2003. Montoya challenged Morales to a fight because Montoya believed Morales was trying to steal his girlfriend. The two men met at Freeman Park at the south end of Fifth Street where they exchanged words but did not fight. According to Morales, Montoya displayed a knife during the confrontation.

Shortly after Montoya left the park on his bicycle, Morales heard screams. He followed the sounds to the alley off Fifth Street. Morales saw Montoya fighting with a man called "Chongo" whom he knew to be affiliated with the Norteños. Morales told Simon he had previously been in a fist fight with Alderete and heard Alderete call Montoya "scrapa." Morales picked up an object - - described

4

alternatively as a "rock" or "dirt clod" - - and threw it at Alderete's back.  Alderete turned to face Morales and began fighting with him.  Morales said Montoya started swinging at Alderete's back.  Alderete held up his hand and said "sorry" before collapsing to the ground.  Morales knew that Montoya "stuck him."  Montoya made a motion with the knife and said, "damn homie I stabbed him."

Morales told Simon that he and Montoya fled to Montoya's house.  Montoya said he stuck Alderete four times.  When he heard police cars driving into the area, Montoya threw the knife over the fence behind his apartment.  He also told Morales to throw his pocket knife over the fence.

Morales acknowledged that both he and Montoya were "southerners."  However, he explained that he would not get mad if someone called him "scrapa" because he was a "southsider."  Before the stabbing, Morales said he told Montoya he did not "play . . . shit" over territory.  "I don't play red or blue whatever homie, But ay, don't get me wrong I'm still down for . . . my side homie."  Simon testified that Morales had Sureño tattoos on his body, including the word "Sur" on his left hand and three dots on his right hand.

Police investigators found two knives in the vacant lot adjacent to Montoya's apartment.  One had a double-edged steel blade and a black plastic handle.  The other was a pocket knife.  Further analysis revealed Alderete's DNA in blood stains on the knife with the double-edged blade, but none on the pocket knife.  There were no fingerprints on either knife.

The autopsy showed that Alderete suffered six stab wounds on his back, two of which caused his death.  One fatal wound was four and a half inches deep and the other six inches deep.  These stab wounds punctured Alderete's lungs, causing severe bleeding into the chest cavity.  The autopsy also revealed an abrasion behind Alderete's right ear which appeared to have been caused by a hard object with well-defined edges, like a brick or piece of concrete.  Alderete had a blood-alcohol level of 0.14 percent at the time of his death.  He was 5'10" tall and weighed 289 pounds.  Alderete had a dot tattooed on the index finger of his right had and four dots on the fingers of his left hand.

Sergeant Steven Gill, supervisor of the Gang Violence Suppression Unit of the Woodland Police Department, testified as a gang expert.  Gill stated that there were approximately 250 Sureños and 400 Norteños in Woodland.  He explained that Sureños identify with blue and the number 13, symbolized by tattoos of one and three dots, while Norteños identify with red and the number 14.  According to Gill, both gangs "thrive on their theory of respect," gained by instilling fear in rival gang members and the community at large.  Gang members do not tolerate

disrespect and use violence to increase respect and enhance their gang's reputation.  Gill testified that gang members are expected to back each other up in a confrontation with rival gang members.

It was Gill's opinion that both Montoya and Morales were active members of the Sureño criminal street gang on September 11, 2003, based on their clothing, tattoos, prior involvement in gang-related incidents, and their statements to police.  Gill testified that Montoya was stabbed in the back in a fight with three Norteños at Fifth and North Streets in June 2002.  He also stated that Alderete admitted he was a Norteño as early as 1996.  Since that time, Alderete had been observed flashing gang hand signals and wearing gang symbols and colors.

When asked a hypothetical question based on the circumstances of this case, Gill stated his opinion that the stabbing of Alderete was a gang-related incident.  According to Gill, events like the stabbing make citizens reluctant to report gang activity, help control gang territory and increase drug sales, and send a message to rival gang members that dire consequences result from disrespect.  Gill testified it was significant that both Montoya and Morales admitted they were Sureños, knew Alderete was a Norteño, and recognized Alderete had disrespected Montoya by calling him "scrapa."

Answer, Ex. B, at 4-12.

## B.   **Procedural History**

Petitioner was charged in the September 11, 2003, death of Jesus Alderete, with first degree murder (Cal. Pen. Code § 187(a)) and two enhancements, including that the murder was committed for the benefit of a criminal street gang (Cal. Pen. Code § 186.22(b)(4)) and that Petitioner used a deadly weapon in the commission of the crime (Cal. Pen. Code § 12022(b)(1)) (count 1).  He was also charged with criminal street gang activity (Cal. Pen. Code § 186.22(a)) (count 2), and that he intentionally killed Alderete to further criminal street gang activity (Cal. Pen. Code § 190.2(a)(22)) (count 3).  Following a jury trial, Petitioner was convicted of the first degree murder count, with the jury finding both enhancement charges to be true (count 1).  He was also convicted of participating in a criminal street gang (count 2), and the jury found true the special circumstance that he intentionally killed Alderete to further criminal street gang activity (count 3).  On August 27, 2004, he was sentenced to life imprisonment without the possibility of

1  parole on both count 1 and count 3.  He was also sentenced to life imprisonment without the

2  possibility of parole on the first enhancement to count 1, and an additional year on the second

3  enhancement.  Finally, he was sentenced to an additional two years on count 2.

4        Petitioner appealed his conviction to the California Court of Appeal.  On

5  February 27, 2006, the Court of Appeal issued an order vacating Petitioner's life sentence as to

6  the first enhancement of count 1, staying the two year sentence as to count 2, and affirming the

7  remainder of the judgment.  Petitioner then appealed to the California Supreme Court, who

8  denied his petition for review on May 24, 2006.  Following this denial, Petitioner filed his federal

9  petition for writ of habeas corpus in the United States District Court for the Northern District of

10  California.  His petition was transferred to this court on September 19, 2006, for proper venue.

11  On September 28, 2006, this court appointed counsel for Petitioner, and provided an opportunity

12  for counsel to file an amended petition.  The amended petition was filed on June 15, 2007.

13  Respondent file an answer on August 15, 2007, and Petitioner filed his traverse on  January 11,

14  2008.

15        In his amended petition, Petitioner sets forth five claims: (1) Insufficient evidence

16  to support a finding of premeditation and deliberation; (2) Trial court error in not giving proper

17  jury instruction; (3) Insufficient evidence to support the gang enhancement finding; (4)

18  Prosecutorial misconduct; and (5) California's death penalty statue is unconstitutional, in

19  violation of the Eighth Amendment.

20

21                      **II.  STANDARDS OF REVIEW**

22        Because this action was filed after April 26, 1996, the provisions of the

23  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

24  applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

25  (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

26  does not, however, apply in all circumstances.  When it is clear that a state court has not reached

the merits of a petitioner's claim, because it was not raised in state court or because the court

denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

(9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (reviewing

petition de novo where state court had issued a ruling on the merits of a related claim, but not the

claim alleged by petitioner).  When the state court does not reach the merits of a claim,

"concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

not available for any claim decided on the merits in state court proceedings unless the state

court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined
> by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus,

under § 2254(d), federal habeas relief is available only where the state court's decision is

"contrary to" or represents an "unreasonable application of" clearly established law.  Under both

standards, "clearly established law" means those holdings of the United States Supreme Court as

of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

(citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204, 1210 (9th Cir. 2008) (en

banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

created by state conduct at trial because the Court had never applied the test to spectators'

conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

holdings.  See Carey, 549 U.S. at 74.

          In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

majority of the Court), the United States Supreme Court explained these different standards.  A

state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

the Supreme Court on the same question of law, or if the state court decides the case differently

than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

court decision is also "contrary to" established law if it applies a rule which contradicts the

governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

that Supreme Court precedent requires a contrary outcome because the state court applied the

wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

id. at 406.

          State court decisions are reviewed under the far more deferential "unreasonable

application of" standard where it identifies the correct legal rule from Supreme Court cases, but

unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

that federal habeas relief may be available under this standard where the state court either

1   unreasonably extends a legal principle to a new context where it should not apply, or

2   unreasonably refuses to extend that principle to a new context where it should apply.  See

3   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

4   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

5   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

6   75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

7   even where the federal habeas court concludes that the state court decision is clearly erroneous.

8   See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

9   deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

10  The Supreme Court recently reaffirmed that "[w]here . . . it is the state court's application of

11  governing federal law that is challenged, the decision must be shown to be not only erroneous,

12  but objectively unreasonable."  Waddington v. Sarausad, __ U.S. __, 129 S. Ct. 823, 831 (2009)

13  (citations omitted).  Therefore, the question "is not whether a federal court believes the state

14  court's determination was incorrect but whether that determination was unreasonable - a

15  substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

16          The "unreasonable application of" standard also applies where the state court

17  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

18  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

19  are considered adjudications on the merits and are, therefore, entitled to deference under the

20  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

21  The federal habeas court looks to the last reasoned state court decision as the basis for the state

22  court judgment.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-05 (1991); Avila v. Galaza, 297

23  F.3d 911, 918 (9th Cir. 2002).

24          A writ of habeas corpus is generally available under 28 U.S.C. § 2254 only on the

25  basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768

26  F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

10

1  not available for alleged error in the interpretation or application of state law.  See Middleton,

2  768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

3  Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

4  issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

5          A "claim of error based upon a right not specifically guaranteed by the

6  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

7  infects the entire trial that the resulting conviction violates the defendant's right to due process."

8  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

9  Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

10  claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

11  miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

12  F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

13          The Ninth Circuit has also reminded us that "[h]abeas corpus is an 'extraordinary

14  remedy' available only to those 'persons whom society has grievously wronged and for whom

15  belated liberation is little enough compensation.'"  Juan H. v. Allen, 408 F.3d 1262, 1270 (9th

16  Cir. 2005) (quoting Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993)).

17

18                          **III.  DISCUSSION**

19      **A.     INSUFFICIENT EVIDENCE**

20          Petitioner's first claim is that there was insufficient evidence for the jury to find

21  he acted with premeditation and deliberation to support a finding of first degree murder. His third

22  claim is that there was insufficient evidence to support the gang enhancements.

23          When a challenge is brought alleging insufficient evidence, federal habeas corpus

24  relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

25  light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

26

1  beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under Jackson,

2  the court must review the entire record when the sufficiency of the evidence is challenged on

3  habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

4  evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The

5  question is not whether we are personally convinced beyond a reasonable doubt.  It is whether

6  rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

7  303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  Further, the

8  Ninth Circuit has held that the AEDPA requires an additional degree of deference to a state

9  court's resolution of a sufficiency of the evidence claim.  Consequently, habeas relief is not

10 warranted unless "the state court's application of the Jackson standard [was] 'objectively

11 unreasonable.' "  Juan H., 408 F.3d at 1275 n.13.  The federal habeas court determines sufficiency

12 of the evidence in the context of the substantive elements of the criminal offense, as defined by

13 state law.  See Jackson, 443 U.S. at 324 n.16.

14              1.       PREMEDITATION AND DELIBERATION

15             Here, the state court set forth the relevant state law in reviewing Petitioner's

16 challenge of his conviction on the basis of sufficiency of the evidence to find he acted with

17 premeditation and deliberation.  The court stated:

18              The [California] Supreme Court explained what the prosecution
               must prove to establish the "premeditation" and "deliberation"
19              required to support a verdict of first degree murder.  "A verdict of
               deliberate and premeditated first degree murder requires more than
20              a showing of intent to kill. . . . 'Deliberation' refers to careful
               weighing of considerations in forming a course of action;
21              'premeditation' means thought over in advance. [Citations.] 'The
               process of premeditation and deliberation does not require any

22

23        [2]      Even though Jackson was decided before AEDPA's effective date, this expression
          of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
24        decision denying relief in the face of a record establishing that no rational jury could have found
          proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
25        application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir.
          2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of
26        review because a rational jury could make the finding at issue).

extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 . . . 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

(Opinion at 13-14).

Accordingly, under California state law, an inference of premeditated murder may be found where: the evidence shows planning, motive and manner; where there is a strong showing of planning; the evidence shows motive and planning; or where the evidence shows motive and manner.

The state appellate court found sufficient evidence of all three elements.  The court found evidence of planning in that Petitioner retrieved the knife he had discarded earlier in the evening and returned to fight the victim after the victim insulted him, and that Petitioner only used the knife after the victim's back was turned.  The court stated that "[a] reasonable jury could conclude Montoya had ample time to plan his actions and to await the opportunity to attack when Alderete was vulnerable, between the time Alderete began insulting him and the time he stabbed Alderete."  (Opinion at 14).

The court found evidence of motive to kill in the undisputed evidence that Petitioner and the victim were rival gang members, that the victim harassed both Petitioner and Petitioner's mother, that the victim insulted Petitioner prior to the stabbing, and that the victim may have stabbed Petitioner the previous year.  The court concluded that "[a] reasonable jury could infer Montoya killed Alderete to uphold the general reputation of the Sureños or to retaliate

1   against this particular Norteño for the insults and earlier assault." (Opinion at 15).

2          Finally, the court found evidence that the "method was consistent with a

3   premeditated killing." (Id.)  The method evidence included that Petitioner and his co-defendant

4   acted together, Petitioner waited to stab the victim until he was distracted and turned his back,

5   and Petitioner stabbed the victim six times in the back causing significant wounds, including the

6   fatal six-inch and four and one-half inch wounds.  The court therefore concluded there was

7   sufficient evidence of all three elements to support a first degree murder conviction.

8          Petitioner argues that the only evidence before the jury was the brutality of the

9   offense, which is insufficient to find premeditation and deliberation.  He also argues that his

10  actions were an impulsive response to the victim's threats, including retrieving his knife which

11  was only 150 feet away from where the fight occurred, and in response to his rational fear of

12  being stabbed again based on his previous experience in the same neighborhood.  He claims that

13  the appellate court's finding of planning from Petitioner's retrieval of his knife, of motive from

14  gang membership, and method from the location of the stab wounds are not proof beyond a

15  reasonable doubt of each and every element of the charge.  In addition, Petitioner argues his

16  intoxication prevented him from forming the requisite mental state for first degree murder, and

17  the state court's determination that he was in full command of his faculties was an unreasonable

18  determination based on the facts presented at trial.  According to Petitioner, this was simply a

19  street fight that ended in death; it was not a premeditated murder.  At best, Petitioner states, the

20  evidence shows an intent to kill, but not premeditation to do so.

21         Respondent argues there was sufficient evidence for the jury to find planning and

22  motive.  According to Respondent, there was ample time for Petitioner to form the cold,

23  calculated intent to kill.  In addition, there was sufficient evidence that the method of killing was

24  consistent with premeditation.  Finally, Respondent argues that, especially after applying the

25  additional layer deference required, the state court finding was not an unreasonable application of

26  the Jackson standard.  See 443 U.S. 307.

Because the state court reviewed the evidence to determine whether a rational jury could find premeditation, the court concludes that it applied the correct test under <u>Jackson</u>. Therefore, this court reviews to determine whether the state court's decision was an unreasonable application of <u>Jackson</u>.

On habeas review, this court does not pass its own judgment on Petitioner's guilt. Instead, this court is to decide whether, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. <u>See</u> <u>Jackson</u>, 443 U.S. at 319.   Petitioner was found guilty of the first degree murder of Jesus Alderete, in violation of California Penal Code § 187.   Under California law, in order to be found guilty of first degree murder, the jury had to find Petitioner's actions were "willful, deliberate, and premeditated."   Cal. Penal Code § 189.   Otherwise, the most Petitioner could have been found guilty of would have been second degree murder.   <u>See</u> <u>id.</u>

Petitioner has not presented any clear and convincing evidence which would rebut the presumption that the state court's factual determinations are accurate.   <u>See</u> 28 U.S.C. § 2254(e)(1).   Viewing the evidence as determined by the state court, this court must conclude the state court's application of <u>Jackson</u> was not unreasonable.   The court agrees that there was sufficient evidence to permit any rational jury to conclude that Petitioner killed with premeditation and deliberation.   The state court's finding that the evidence showed planning, motive and method was not unreasonable.   As the state court determined, Petitioner's actions in retrieving his knife and waiting for the opportunity to strike when the victim was vulnerable by turning his back to Petitioner, could be sufficient to find planning.   A finding of motive is supported by the evidence that Petitioner and the victim were members of rival gangs, the victim had a history of harassing Petitioner, and had insulted Petitioner just prior to the incident. Finally, the method of the killing, six stab wounds to the victim's back, could also support the jury's finding.

///

1   Accordingly, the undersigned finds that the California Appellate Court's decision

2   was not an unreasonable application of <u>Jackson</u>.  Viewing the evidence in the light most

3   favorable to the prosecution, any reasonable jury could have found Petitioner acted with

4   premeditation and deliberation.

5   2.   GANG ENHANCEMENTS

6   Petitioner's third claim is that there was a lack of evidence to support the gang

7   enhancements.[3]  Petitioner was charged with three gang related charges.  First, in count one, he

8   was charged with an enhancement to the first degree murder charge, that the murder was

9   committed for the benefit of a criminal street gang, pursuant to California Penal Code §

10  186.22(b)(4) (referred to as "the gang enhancement" ).  Second, in count two, he was charged

11  with criminal street gang activity, pursuant to § 186.22(a) (referred to as "the substantive gang

12  charge").  Finally, in count three, he was charged with intentionally killing to further street gang

13  activity, pursuant to § 190.2(a)(2) (referred to as "the gang special circumstance").  The jury

14  found Petitioner guilty on all counts and all gang related charges to be true.

15  The California Court of Appeal affirmed the judgment with the following

16  modifications:  the gang enhancement to count one (§ 186.22(b)(4)) was vacated, and the

17  sentence on that enhancement was stricken; and the substantive gang charge (§ 186.22(a)) was

18  affirmed, but the sentenced imposed thereon was stayed.  The court also affirmed the gang

19  special circumstance (§ 190.2(a)(2)).  As the state court vacated the gang enhancement to count

20  one,[4] and the sentence thereon was stricken, any arguments Petitioner makes as to that gang-

21

22      [3]   Petitioner offers the same argument for his attack on all of the gang related
     findings.  Therefore, the undersigned discusses them together as Petitioner did.  In addition, the
23   state court found the same evidence supported the separate charges.

24      [4]   The gang enhancement to count one was based on California Penal Code §
     186.22(b)(4).  Section 186.22(b)(4) only applies to those convictions specifically enumerated in
25   that paragraph, such as home invasion robbery, carjacking, extortion, and threats to victims or
     witnesses.  The court concluded Petitioner's conviction of murder was not one of the specifically
26   enumerated crimes, so that section did not apply.  (<u>See</u> Opinion at 16-18).

1  related charge are moot.  The only gang-related charges challenged, therefore, are counts two and

2  three, the substantive gang charge and the gang special circumstance.

3          As to Petitioner's challenge to the sufficiency of the evidence to support the

4  substantive gang charge (§ 186.22(a)), the state court stated:

5              in order to convict defendants of criminal gang activity, the
               prosecution was required to prove "that the gang (1) is an ongoing
6              association of three or more persons with a common name or
               common identifying sign or symbol; (2) has as one of its primary
7              activities the commission of one or more of the criminal acts
               enumerated in the statute; and (3) includes members who either
8              individual or collectively have engaged in a 'pattern of criminal
               gang activity' by committing, attempting to commit, or soliciting
9              two or more of the enumerated offenses (the so-called 'predicate
               offenses') during the statutorily defined period."
10

11  (Opinion at 20 (citing Cal. Penal Code § 186022(e), (f); People v. Gardeley, 14 Cal.4th 605, 617

12  (1996)).

13          Based on the prosecution's gang expert, Sergeant Gill, the court found sufficient

14  evidence that the Sureño gang is an active gang, and that associated gang members had

15  committed prior criminal acts.  The court specifically found that "Sergeant Gill's testimony and

16  the supporting documents provided sufficient evidence that Angel Morales and Oscar Velasco

17  committed the predicate offenses as members of the same criminal gang to which defendants

18  belonged."  (Opinion at 22).  The court further found:

19              [e]vidence adduced at trial showed that the alley where Alderete
               was killed, as well as the neighborhood surrounding it, was Sureño
20              territory.  Defendants, both Sureños, knew Alderete was a Norteño.
               Montoya and Morales heard Alderete call Montoya "scrap" or
21              "scrapa," a derogatory term for Sureño, just before the fight broke
               out.  Taking this evidence into consideration, Sergeant Gill
22              testified that gang members often react to verbal insults with
               violence because they do not tolerate disrespect and want to instill
23              fear in rival gang members.  He responded to a hypothetical
               question based on the facts of this case by stating his opinion that
24              the killing was a gang-related incident.

25  (Opinion at 22-23).

26  ///

17

As to Petitioner's challenge to the sufficiency of the evidence to support the gang special circumstance charge (§ 190.2(a)(22)), the court stated:

> Section 190.2, subdivision (a)(22) reads: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

(Opinion at 23-24).

The court then concluded there was sufficient evidence to support the jury's findings over Petitioner's assertion that "the prosecution failed to prove he had the specific intent to participate in criminal gang conduct or that he stabbed Alderete to promote the gang's criminal enterprises."   Based on the evidence set forth in relation to the substantive gang charge pursuant to § 186.22(a), as discussed above, the court found the evidence "including Sergeant Gill's expert testimony, also supports the jury's true finding as to Montoya in count 3."  (Opinion at 24).

Petitioner argues there was insufficient evidence for the jury to find the crimes were committed both for the benefit of or in association with a gang and to promote, further, or assist in criminal conduct by gang members.[5]  He claims the prosecution failed to prove he had the specific intent[6] to participate in gang activity and that the crime was committed in furtherance of a criminal street gang.  He further attacks Sergeant Gill's testimony, arguing the lack of

---

[5]     The California Supreme Court has analyzed Proposition 21, which was enacted to combat gang crime in California.  See Robert L. v. Superior Court, 135 Cal. Rptr. 2d 30, 38-39 (Cal. 2003).  The Court quoted the Ballot Pamphlet as stating "Life without the possibility of parole or death should be available to murderers who kill as part of any gang-related activity."  Id. at 38.  The California Supreme Court has interpreted the voter's intent, in passing Proposition 21, to encompass all gang-related killing.  See People v. Shabazz, 40 Cal. Rptr. 3d 750, 757 (Cal. 2006).

[6]     The specific intent argument only related to the § 186.22(b)(1) enhancement, which the state court vacated.  There is no evidence before this court that any specific intent was required under either § 186.22(a) or § 190.2(a)(22).  Therefore, the undersigned does not address the specific intent argument.

1  evidence to support his opinion and that his opinion was based on speculation, conjecture,

2  guesswork or supposition.

3         As discussed above, the issue before this court is whether, viewing the evidence in

4  the light most favorable to the prosecution, no rational trier of fact could have found proof of

5  guilt beyond a reasonable doubt.  See Jackson, 443 U.S. at 319.

6         At trial, Sergeant Gill was recognized as an expert.  (Reporter's Transcript (RT) at

7  487).  As an expert, he testified as to the primary activities of the Sureños, that "[p]rimarily . . .

8  the Sureño criminal street gang as within most gangs is the sales of drugs, also with the Sureños

9  criminal street gang is assaults, to include assault with great bodily harm and assault likely to

10  produce great bodily harm and with weapons."  (RT at 492).  This opinion was based on his

11  "prior training and experience and in talking with gang members, specifically Sureño gang

12  members."  (Id.)  Further testimony from Sergeant Gill provided the jury with information about

13  the Sureño gang, including that the gang members "thrive on their theory of respect" and that

14  they "gain respect by instilling fear and intimidation in the community at large and in rival gang

15  members.  Gang members use violence to increase the respect and enhance a gangs reputation."

16  (RT at 499).  He testified that "gang members gain respect through assaults by proving that they

17  can physically protect themselves, their fellow gang members, and are willing to do what is

18  necessary to enhance the gangs reputation."  (RT at 499-500).  Sergeant Gill also testified that

19  disrespect is not allowed by gang members, and the use of derogatory terms, such as "scrap"

20  would be a sign of disrespect.  (RT at 500-01).

21         As to Petitioner's membership in the gang, Sergeant Gill testified that "based on

22  his prior admitting that he was a Sureño gang member, gang tattoos of Sureño, related to - - being

23  a Sureño gang member, his prior contacts by police where he's been involved in criminal gang

24  activity and, in fact, been with other Sureño gang members" it was his opinion that Petitioner

25  was an "active participant in the Sureño criminal street gang, and that his participation was [at]

26  the direction of, association with and/or for [the] benefit of a Sureño criminal street gang."  (RT

at 512).

Based on Sergeant Gill's testimony, as well as the statement Petitioner and his co-defendant provided to the police and the other evidence produced at trial, there was a sufficient basis for any reasonable jury to find the crime was committed by an active gang member in furtherance of the gang.  Sergeant Gill's testimony was not, as Petitioner argues, based on speculation and conjecture.  Sergeant Gill was recognized as a gang expert, and as the state court found, his "testimony was not 'mere speculation,' but proper expert opinion."  (Opinion at 23).  The state court determined that the police observed several gang related tattoos on Petitioner's body, found gang related objects at his residence, and Petitioner acknowledged to the police that he was in fact a member of the Sureño gang.

The Ninth Circuit has recognized that California law does not criminalize mere gang membership.  See Briceno v. Scribner, 555 F.3d 1069, 1080 (9th Cir. 2009 (citing People v. Gardeley, 59 Cal. Rptr. 2d 356 (Cal. 1997)).  It does, however, increase the penalty for gang related crimes.  See id. at 1080-81 (finding that under California Penal Code § 186.22(b)(1), even though two gang members committed a robbery together, there was no evidence it was done with the intent to further gang activity where the crime did not occur on gang turf, the defendants did not identify themselves as gang members, and there was no evidence connecting the robberies to the gang).  Here, there was evidence before the jury that the murder was gang-related, including that the confrontation which ended in death occurred on gang turf, was between members of opposing gangs, and was instigated by a disrespectful gang slur.  This could all support the jury's finding that the murder was a gang-related activity.  That there was evidence presented to support Petitioner's theory of a non-gang related street brawl between two intoxicated men, does not change this analysis.  It was for the jury to weigh the evidence and resolve any conflicts in testimony.  See Jackson, 443 U.S. at 319.

Viewing the evidence as determined by the state court, this court must conclude the state court's application of Jackson was not unreasonable.  The undersigned agrees that there

1   was sufficient evidence to permit any rational jury to conclude that the gang-related

2   enhancements applied to petitioner.

3

4   **B.     JURY INSTRUCTION ERROR**

5          Petitioner's second claim is the trial court erred in refusing to give the jury an

6   instruction on voluntary intoxication, CALJIC 4.21.[7]

7          As a general rule, federal habeas corpus relief is only available for an alleged error

8   in jury instructions when the instructional error "'so infected the entire trial that the resulting

9   conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v.

10  Naughten, 414 U.S. 141, 147 (1973)).  A challenge to jury instructions does not generally give

11  rise to a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.

12  1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  To warrant federal habeas relief, a

13  challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally

14  condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."

15  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S.

16  141, 146 (1973)).   An alleged instructional error must have "had substantial and injurious effect

17  or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637

18  (1993).  A habeas petitioner has an "especially heavy" burden "[w]here the alleged error is the

19  failure to give an instruction."  Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992) (citing

20  Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  "An omission, or an incomplete instruction, is

21  less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

22  155 (1977).

23  _____

24       [7]     CALJIC 4.21 states, in relevant part: "If the evidence shows that the defendant
    was intoxicated at the time of the alleged crime, you should consider that fact in deciding
25  whether defendant had the required [specific intent] [mental state]. ¶ If from all the evidence you
    have a reasonable doubt whether the defendant formed that [specific intent] [mental state[s]], you
26  must find that [he] [she] did not have such [specific intent] [mental state[s]]."

1    "When habeas is sought under 28 U.S.C. § 2254, '[f]ailure to instruct on the

2    defense theory of the case is reversible error if the theory is legally sound and evidence in the

3    case makes it applicable.'" Clark v. Brown, 450 F.3d 989, 904-05 (9th Cir. 2006) (quoting

4    Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004)); see also Bradley v. Duncan, 315

5    F.3d 1091, 1098 (9th Cir. 2002), Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000).

6    Here, the California Court of Appeal set forth the state law on the issue of

7    voluntary intoxication.

8    > A defendant is entitled to an instruction on voluntary intoxication
> as a defense to a specific intent crime "only when there is
9    > substantial evidence of the defendant's voluntary intoxication and
> the intoxication affected the defendant's 'actual formation of
10   > specific intent.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677.)

11   (Opinion at 25).

12   The appellate court agreed "with the trial court that there was insufficient

13   evidence of voluntary intoxication upon which to give the instruction." (Id.)  Indeed, the court

14   found

15   > overwhelming evidence that Montoya was in full command of his
> faculties during the period before and after he murdered Alderete.
> Montoya had a knife with him when he was riding his bike but
16   > threw it away when Officer Keeney turned to approach him.
> Keeney did not notice that Montoya was under the influence.
17   > When Alderete started insulting him, Montoya not only
> remembered where he had thrown the knife but was able to recover
18   > it.  He attacked with the knife when Alderete turned to face
> Morales.  Montoya moved in and knifed Alderete in the back when
19   > Alderete was the most vulnerable.  Montoya told Morales that
> night, immediately after the stabbing, "damn homie I stabbed him."
20   > As Montoya and Morales fled, Montoya said, "I'm tired of this
> shit."  Montoya also knew he had stabbed Alderete multiple times
21   > when he told Morales he stuck Alderete four times.  Once the pair
> reached Montoya's apartment, Montoya threw his knife over the
22   > fence and insisted that Morales throw away his pocket knife as
> well.  Significantly, Montoya was able to remember, fabricate, and
23   > ultimately recount the events in order and in detail to Detective
> Simon the following day.

24   (Id. at 25-26)

25   Further, the appellate court found that even if the trial court erred, the error was

26   harmless because, while Petitioner's co-defendant testified that Petitioner was under the

influence, there was no evidence Petitioner was unable to form the intent to kill.

Petitioner argues there was sufficient evidence to support the instruction, and the trial court's refusal to give it violated his rights to a fair trial.  Petitioner claims he is not arguing that his intoxication resulted in his inability to form the intent to kill.  Instead, he states the evidence that he was intoxicated negated the theory that the killing was the result of careful thought and weighing of considerations, as required for a finding of first degree, as opposed to second degree, murder. He states given his intoxication, the prosecution could not rebut the presumption that the murder was second degree, not first.

Respondent contends that the lack of an instruction did not preclude the jury from considering the evidence of Petitioner's intoxication.  No witness testified that they saw Petitioner ingest any methamphetamine or alcohol.  In addition, there was conflicting testimony regarding Petitioner's intoxication, including testimony that Petitioner did not appear intoxicated.

Reviewing the trial transcript, the undersigned finds limited testimony on the issue of Petitioner's intoxication.  Petitioner did not testify, but his co-defendant, Antonio Morales, testified in his own defense.  During Mr. Morales' testimony, while being questioned by his defense counsel, the following exchanges occurred:

> Q:      Did you know whether Mr. Montoya was tired or exhausted that night, whether he - - what kind of shape he was in?
> A.      He looked very - - he was been up for a couple days.
> Q.      He looked like he hadn't gotten any sleep for awhile?
> A.      Yeah.
> Q:      Did he appear to be intoxicated or under the influence of anything when you talked to him?
> A.      Meth.
> Q:      Methamphetamine?
> A.      Yeah.
> Q.      You knew that sometimes he used meth?
> A.      Yeah.  Yes.
> . . .
>
> Q:      Why didn't you fight at the park?
> A.      Cause I told him, I told him, "Before we fight, man, I want to know what was in your mind, what's your trip, what's your problem, man?"

/ / /

1           And he was telling me "That you figure to get with my girlfriend." I mean that doesn't mean I was trying to get - - he say "You talking to my girlfriend."

2           "That doesn't mean I was trying to get her, man. You are trippin', man. You are trippin'."

3           He kept saying "No, I am not trippin', I am not trippin'."

4           "Nah, man, trippin'. I know you have been up for a couple of days and you are still man though, you are still drinking, man, but you are trippin'."

5           And "Nah, I am not trippin', I am not trippin'." Kept saying that. I knew he was.

6           I told him, "You know, what, Carlos? People will think you are crazy on drugs, man. I will just tell them that you beat me and tell people you beat me because they are going to think you are crazy, man, going crazy with the drug."

8           So and that's about it. I guess it got to him, calm.

9    Q:    He didn't fight?
     A.    Nah.

10   Q:    Did you see the knife again? Did he pull the knife on you again?
     A.    Nah, no more.

11   Q:    Just talk?
     A.    Yeah.

12   Q:    There has been testimony that you said something to him like "I will say you won."

13          Would you explain that to the jury, if that happened?
     A.    Yeah, cause people was going to say he was going crazy

14  cause he knew better that I ain't trying to get his girlfriend and people knew that I wasn't going to do that.

15          I told him "You know what? I am going to tell people that you won, man, cause people going to think you are crazy, man.

16  And plus I don't want to fight you, man, in what condition you are, man."

17    . . .

18   Q:    So what did you think had happened?
     A.    Thought he was going to get hurt, man.

19   Q:    Did you think that Mr. Montoya was in any condition to fight?

20   A.    No.
     Q:    Why?

21   A.    I could tell he was tired and weak, I mean. And plus all this talk was getting to me, I was trying to get his girlfriend. I thought

22  Carlos is not in a good position right now. So . . .

23  (RT) at 719, 725-26, 728).

24           Petitioner's counsel did not question Mr. Morales further on the issue of

25  Petitioner's intoxication or signs thereof. (See RT 743-44.) Officer Keeney's testimony is also

26  relevant to this issue. On cross-examination, Petitioner's attorney had the following colloquy

with Officer Keeney:

> Q:      . . . And now going back to your initial contact with Juan
> Carlos Montoya, you don't recall what he was wearing that night?
> A.      No, I don't.
> Q:      Okay, Did he appear to be under the influence to you?
> A.      I'm not a drug certified person, so I can't honestly testify to
> that.
> Q:      But would it be something you would note in your report if
> someone appeared to be under the influence?
> A.      Depends upon if they were under the obvious signs of being
> under the influence.
> Q:      Let me put it this way, did you make any note in your report
> that Mr. Montoya was under the influence?
> A.      No, I didn't.

(RT at 180-81).

Petitioner's counsel requested the voluntary intoxication jury instruction, arguing:

> I believe there is sufficient evidence during the course of the trial
> to support that instruction. [¶] Mr. Morales, when he testified
> talked about how my client was not in any condition to fight.  He
> had been using drugs, had been drinking and Mr. Morales mentions
> in his interview with the police officer that my client had been
> using drugs as well, was not in any shape to fight.

(RT at 854).

The trial court, citing <u>People v. Williams</u>,[8] stated:

> I did not recall hearing any evidence in the trial that that was an
> issue whatsoever.  The only evidence that was elicited regarding
> Mr. Montoya's state of mind came from the co-defendant, Mr.
> Morales' observation and his opinion as to Mr. Montoya's
> condition. [¶] So I do not find there was substantial evidence
> presented to merit consideration of 4.20. [¶] So that is why I
> refused it.

(RT at 855-56).

Then, during closing arguments, counsel's only reference to Petitioner's condition

was as follows:

> Back on September 10th late at night, tenish, my client calls
> Mr. Morales and is upset because he thinks Mr. Morales is making

---

[8]      The California Supreme Court in <u>Williams</u> held that a voluntary intoxication jury instruction is required "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.'" <u>People v. Williams</u>, 66 Cal. Rptr. 2d 573, 598-99 (Cal. 1997) (quoting <u>People v. Horton</u>, 47 Cal. Rptr. 2d 516 (Cal. 1995)).

1    moves on his girlfriend.
            He is upset because he has heard that it is his friend who is
2    making these moves.  He is upset because perhaps he has been
     using drugs and perhaps has been up several days in a row.  He
3    confronts Mr. Morales on the phone and wants to meet him to box.

4    (RT at 958).

5           Based on this transcript, the state appellate court "agree[d] with the trial court that

6    there was insufficient evidence of voluntary intoxication upon which to give the instruction."

7    (Opinion at 25).

8           On this record, the undersigned cannot find that the trial court's failure to give the

9    jury an instruction on voluntary intoxication "so infected the entire trial that the resulting

10   conviction violate[d his] due process." Estelle, 502 U.S. at 72.  There was limited testimony

11   regarding Petitioner's intoxication.  The only testimony was when his co-defendant testified that

12   Petitioner looked like he had not slept in days, was known to use methamphetamine and alcohol,

13   and had possibly used both the date of the incident.  In addition, a police officer who had contact

14   with Petitioner shortly before the incident, testified that Petitioner was not obviously intoxicated.

15   In addition, Petitioner's defense theory was more that he acted in self-defense based on fear and

16   prior experience, rather than his intoxication.  On habeas review, Petitioner is arguing that his

17   intoxication prevented him from premeditating and deliberating, not that it prevented from

18   forming the intent to kill.  He also argues that even if this court does not find the failure to

19   instruct prejudicial when considered alone, that viewed along with all the other errors at trial, the

20   cumulative result was a fundamentally unfair trial.

21          The undersigned finds there was no error by the trial court in refusing to give the

22   jury instruction based on the lack of substantial evidence.  Even had there been an error, any such

23   error did not so infect the entire trial that the result was a denial of Petitioner's due process

24   rights, whether considered by itself, or in conjunction with other alleged errors.  There simply is

25   no showing that the state court's decision was objectively unreasonable.

26   / / /

1          **C.    PROSECUTORIAL MISCONDUCT**

2          Petitioner's fourth claim is that prosecutor's pervasive misconduct violated his

3  rights to a fair trial, to call witnesses and to present a defense.  He cites two instances which led

4  to this claim: first the prosecutor's improper use of a witness' misdemeanor conviction files, and

5  second, the prosecutor's improper comments during his closing arguments.

6          Success on a claim of prosecutorial misconduct requires a showing that the

7  conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

8  process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to

9  determine "whether, considered in the context of the entire trial, that conduct appears likely to

10  have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

11  Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

12  determined, such error is considered harmless if the court, after reviewing the entire trial record,

13  concludes that the alleged error did not have a "substantial and injurious effect or influence in

14  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

15  deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

16  substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-61 (1946).  Depending on the

17  case, a prompt and effective admonishment of counsel or curative instruction from the trial judge

18  may effectively "neutralize the damage" from the prosecutor's error.  United States v.

19  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

20          Here, Petitioner argues the prosecutor acted improperly by using deceptive and

21  reprehensible methods during the examination of a defense witness.  Specifically, that the

22  prosecutor attempted to impeach the witness' credibility by raising a criminal conviction.  He did

23  so by asking the witness if she had been to court before on her own cases, and bringing a stack of

24  files within view of the jury, presumably to convey the idea to the jury that she had several

25  convictions, instead of just the one he was allowed to impeach her on.  Upon objection, the judge

26  heard the issue outside the presence of the jury, and determined that the witness may be

impeached by her misdemeanor criminal threat conviction, but that the facts of that conviction would not come in.  (RT 669, 671).  The judge denied a mistrial motion.  (RT at 674).  Back in the presence of the jury, the prosecutor asked the witness if she had been "convicted of threats to commit a crime resulting in death or great bodily injury" leaving open the question of whether this conviction had been a felony or misdemeanor.  Defense counsel had to clarify it was in fact a misdemeanor.  (RT at 685).

The second objection Petitioner has to the prosecutor's actions occurred during closing arguments.  Petitioner claims the prosecutor made disparaging statements about this witness and improperly editorialized during his review of her testimony.  The objectionable statements included the prosecutor labeling the witness a liar, stated her testimony was garbage, and disparaging the defense position of self-defense, stating "[i]t's outrageous that that's even suggested."  (RT at 909).[9]

On direct appeal, the California Court of Appeal "agree[d] with the trial court that although the prosecutor's conduct was improper, it did not rise to the level of prosecutorial misconduct and require the court to declare a mistrial."  (Opinion at 28).  The court set forth the law, that a constitutional violation occurs when a prosecutor engages in a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."  (Opinion at 28 (quotations omitted)).  The court continued by stating that it is improper

> for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means.
> In this case, the prosecutor had reason to expect Valeria Morales to confirm that she had been convicted of making a criminal threat.  Although the prosecutor first asked Valeria whether she had been in court before for her "own cases," the discussion that followed the defense objection focused on the

---

[9]      Respondent claims this second objection was not raised on direct appeal, but has waived any exhaustion issues.

1    single misdemeanor.  There is no indication the jury noticed the
     files on the table between the time the prosecutor asked Valeria
2    whether she had been in court before and the time the court sent
     the jury to lunch - - less than half a page in the report's transcript.
3    The prosecutor's single act of thumbing through a stack of case
     files did not constitute an egregious pattern of misconduct that
4    violated defendants' constitutional rights.

5    (Opinion at 28-29).

6            The prosecutor, in his closing arguments, attempted to discredit Petitioner's

7    imperfect self defense theory.  He stated:

8            . . . This is not self-defense, ladies and gentlemen.  This is not self-
             defense. no.  No, this is not self-defense.  It's not. [¶] [The victim]
9            was butchered.  He was beaten.  This is not self-defense.  It's
             outrageous that that's even suggested.  What more do you need to
10           do than look at these photos and then look at them? [¶] This is not
             self-defense, not a scratch on them, not one scratch.  This was
11           cold-blooded gang murder.  I said it in the beginning and I say it
             again.
12   (RT at 909).

13           Then in his rebuttal argument, the prosecutor addressed Petitioner's claim that the

14   victim previously stabbed him.  He stated:

15           Mr. Alderete never stabbed Mr. Montoya before. [Defense counsel]
             suggested that that was the case and I believe it was Valeria
16           Morales, a sureno, Mr. Morales's sister, and a woman who came
             forward just a few months ago with this lie.  She is the only person
17           that said that.  She is a liar and she perjured herself.  She had every
             motive to do it after being told to go find evidence to help this
18           case.

19   (RT at 974).

20           The undersigned finds that the prosecutor's questioning of witness Valeria

21   Morales was, as the state courts found, at best improper.  However, it did not so infect the entire

22   trial with unfairness as to make the resulting conviction a denial of due process.  Even including

23   the statements the prosecutor made during his closing arguments, there is not enough to find his

24   conduct affected the jury's duty to judge the evidence fairly.  A prosecutor calling into question

25   the defense's theory, with the facts presented during testimony, do not violate a defendant's due

26   process rights.  It is expected that a prosecutor would have a different theory than the defense,

1   and would question the defendant's theory.  The prosecutor, in stating that this is not a self-

2   defense case did nothing but argue his position.  There was no improper conduct.  The

3   characterization of the witness may be a bit more problematic.  Reviewing the witness'

4   testimony, it is questionable whether she actually perjured herself.  It appears she had some

5   difficulty with the English language, and therefore may not have understood every question the

6   prosecutor asked.  However, it is for the jury to weigh that evidence, to pass judgment on the

7   witnesses' credibility, and to decide what testimony to believe.  See Jackson, 443 U.S. at 319.

8          Examining the statements by the prosecution, in reviewing the case as a whole,

9   the undersigned agrees with the state court determination that there was no egregious pattern of

10  misconduct which violated Petitioner's constitutional rights.  The state court's decision was not

11  an unreasonable application of federal law.  Including the claims raised here, regarding the

12  prosecutor's statements in his closing arguments which appear not to have been raised below, the

13  undersigned still cannot find the prosecutor's conduct infected the trial with unfairness to such a

14  degree as to make the resulting conviction a denial of Petitioner's due process.

15

16          **E.     DEATH  PENALTY STATUTE**

17          Petitioner's final claim is that California's death penalty statute violates the

18  Eighth Amendment protection against cruel and unusual punishment.  Specifically he argues that

19  as amended, the death penalty statute is unconstitutional because it fails to narrow the class of

20  death-eligible murders and renders the overwhelming majority of intentional first degree murders

21  death-eligible.  He claims that the addition to subdivision (a)(22) to California Penal Code §

22  190.2, opens anew the argument that California's death penalty law is unconstitutional.

23  Petitioner argues that as amended, the number of death eligible crimes includes over 40

24  categories, which cannot be considered "narrow."

25          Respondent sates that Petitioner does not have standing to argue the

26  constitutionality of the death penalty statute because he has not alleged an actual or threatened

1    injury, nor could he, as the death penalty was not sought against him and he was not sentenced to

2    death.  In addition, Respondent argues Petitioner's claims are meritless as the California death

3    penalty statute is sufficiently narrow to meet the Supreme Court criteria.

4            Assuming, without deciding, that Petitioner has the standing to challenge

5    California's death penalty statute, the undersigned finds no merit to his argument.  The

6    imposition of the death penalty in California first requires a determination of death eligibility,

7    then the jury has to find the defendant meets an additional qualification based on special

8    circumstances.  See Cal. Penal Code § 190.2.  The special circumstance qualifications are what

9    Petitioner is challenging.  He claims that the addition of subsection (a)(22), which brings within

10   the statue a murder committed by an active gang member in furtherance of gang activity.

11   Petitioner argues this broadens the statute such that it renders the overwhelming majority of

12   intentional first degree murderers death eligible.

13           The California Court of Appeal rejected this argument stating Petitioner "offers

14   no factual or legal support for his claim that the death penalty law no longer narrows the class of

15   death eligible persons."  (Opinion at 31).  The undersigned finds this decision is not contrary to

16   nor an unreasonable application of clearly established Federal law.  Petitioner cites Godfrey v.

17   Georgia, 446 U.S. 420, 428 (1980) for the proposition that "the sentencer's discretion must be

18   limited by clear and objective standard, providing specific and detailed guidance that allow for

19   the rational review of the process for imposing the death sentence."  (Amended Petition at 27).

20   He then argues that the California law does not adequately distinguish those few cases in which

21   the death penalty should be imposed.

22           California's death penalty law has continuously been held sufficiently narrow to

23   be constitutional.  See Tuilaepa v. California, 512 U.S. 967 (1994).  While Petitioner argues the

24   modifications to the law after the Supreme Court decision in Tuilaepa render the law too broad,

25   the undersigned does not agree.  California law still provides limitations on who can be charged

26   under the death penalty statue, designed to satisfy the narrowing requirements as set forth by the

Supreme Court.  See Zant v. Stephens, 462 U.S. 862 (1983), Furman v. George, 408 U.S. 238 (1972); see also Karis v. Calderon, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002) ("California has identified a subclass of defendants deserving of death and by doing so, it has 'narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed.' Arave v. Creech, 507 U.S. 463, 476 (1993).").   The addition of murders committed by active gang members in furtherance of gang activity does not render the statute over-broad.  While it may add a class of murderers to the eligibility list, it does not do so carte blanch, and the jury is still required to find a special circumstance to be true.  See Cal. Penal Code § 190.2.   Petitioner fails to show how the state court's decision is contrary to, or a reasonable application of, controlling federal law.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that  petitioner's first amended petition for a writ of habeas corpus (Doc. 26) be denied .

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED: August 29, 2009


                                          _____
                                          **CRAIG M. KELLISON**
                                          UNITED STATES MAGISTRATE JUDGE